O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| BRIAN LICHTENBERG,LLC, a California limited liability company; BRIAN LICHTENBERG, an individual,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>ALEX & CHLOE, INC., a California corporation; CHRISTOPHER WALTER LICHTENBERG, an individual; MARKED SHOWROOM, LLC, a Californai limited liability company; JACQUELINE YI, an individual; TU TRAN, an individual KYLE MOCKETT, an individual; KAYTEE ENRIGHT, an individual,<br><br>　　　　　Defendants.<br>_____ | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. CV 13-06837 DDP (PJWx)<br><br>**ORDER DENYING PLAINTIFFS' EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER**<br><br>[Dkt. No. 19] |

　　Presently before the court is Plaintiffs Brian Lichtenberg, LLC and Brian Lichtenberg's Ex Parte Application for a Temporary Restraining Order.  Having considered the submissions of the parties, the court denies the Application.

**I.　Background**

　　Plaintiff Brian Lichtenberg ("Brian") designs clothing and

accessories and distributes his products through Brian Lichtenberg, LLC.  Brian's designs include a series of parodies of designer brands, such as "Homiès" as a play on "Hermès" and "Bucci," a parody of "Gucci."  Brian's spoof or parody logos mimic the style, font, and other elements of the luxury brand designs.  Brian sells shirts, sweatshirts, beanies, and hats bearing the various spoof designs.  Brian alleges that his designs are frequently worn by celebrities and recognized by the public as Brian's work.

Brian's younger brother, Defendant Christopher Walter Lichtenberg ("Chris") is the CEO of Defendant Alex and Chloe, Inc. ("A&C"), which operates a website of its own (the "AC website").  In 2011, Brian allowed Chris to take orders for Brian's apparel on the AC website.  Brian would fill orders taken by Chris, who would collect from the consumer and distribute fifty percent of the proceeds to Brian.  In mid-2011, Brian allowed Chris to post promotional pictures of Brian's products directly on the AC website in an effort to increase traffic to the site.

Brian alleges that in early 2012, he came up with the idea to parody the luxury brand "Balmain," and created a drawing for a design in the style of the Balmain logo but reading "Ballin Paris" (the "Ballin Design," "Design," or "Ballin").  Brian claims that he showed the Design to Chris in confidence in March 2012.

///
///
///
///
///
///

In late 2012 or early 2013, Brian hired Chris as an employee.[1] Chris performed graphic design duties and provided assistance with marketing and promotional activities. As part of these duties, Chris helped Brian craft and send an e-mail reading, "Ballin' With My Homies" to Brian's fashion industry contacts to promote Brian's forthcoming line of Ballin apparel.[2]

Between January 21 and January 31 2013, Chris called in sick to work several times. During that time, Chris contacted Brian's manufacturer in China. (Declaration of Flair Xu.) Chris placed large orders for labels and garments with the same measurements and specifications as Brian's products, purportedly for use in a new clothing line that would be sold "with [Brian]" but on the A&C label. (Xu Decl. ¶¶ 19-21.) During that same ten day span, Chris allegedly sent samples of A&C-labeled Ballin apparel to Brian's industry contacts.[3]

On February 1, 2013, Chris and/or A&C posted images of apparel featuring the Ballin design on social media. A&C-labeled Ballin apparel was listed for sale on the AC website soon after. At some

---

[1] The record is unclear on when Chris became an employee. Brian's declaration states both that Chris began work on January 21, 2013 and that Brian was able to afford Chris' services in December 2012. Brian's declaration further states that Chris "helped" with a "Ballin" marketing campaign in November. The Application for a TRO claims that Chris was an employee in November 2012, but also that Chris became a full-time employee in January 2013.

[2] While the Application asserts that Chris was assigned to convert Brian's hand-drawn Ballin Design into electronic format, the portion of Brian's declaration cited does not support that contention.

[3] At least one of these contacts, Ben Taylor, later forwarded his correspondence with Chris to Brian. (B. Lichtenberg Decl., Ex. 25.)

later point in time, Brian brought his own Ballin apparel to market on his BLTEE label.  Both Brian and Chris currently sell virtually identical apparel bearing the Ballin Design.

As early as March 14, 2013, Chris and/or A&C sent cease and desist letters to Brian's distributors, claiming that Chris invented the Ballin Design and demanding that distributors cease selling Brian's Ballin products.  Chris also maintained an active social media presence, with which he frequently claimed to be the author of the design and stated that Brian stole the Ballin design from him.  (See, e.g. id. ¶ 131 ("no confusion necessary.  The Ballin Paris design was made by us here at [A&C], not#LyinBrian lol . . . .".)

Brian frequently posted images of celebrities and models wearing Brian's Ballin merchandise on social media pages.  At least some of these personalities expressly granted Brian permission to post the photographs.  (B. Lichtenberg Decl. ¶¶ 126, 133.)  In several cases, identical images soon appeared on A&C's pages, usually identifying the garments depicted as "an original Alex & Chloe Ballin Paris design," "by Alex & Chloe," or other words to that effect.  (Id. ¶¶ 133-144.)  The subjects of the photos did not authorize Chris to use the images.  In one instance, a model depicted in an image posted to an A&C website went so far as to comment that she was wearing one of Brian's sweatshirts, not an A&C product.  (Id. ¶ 131.)  A&C responded, "[a]ctually the BALLIN PARIS design including this sweatshirt you are wearing is an Original and Official design by [A&C] NOT [Brian] . . . ."  (Id.)

In March 2013, Plaintiffs filed a suit against Chris and A&C in Los Angeles County Superior Court.  Plaintiffs obtained a

4

temporary restraining order, but were not successful in their motion for a preliminary injunction. Plaintiffs then dismissed their state court action and, on September 17, 2013, filed the instant suit in this court. Plaintiffs' complaint alleges seven causes of action against Defendants, including causes of action under state law and the Lanham Act, 15 U.S.C. §1125. Plaintiffs now seek a Temporary Restraining Order ("TRO").

**II.  Legal Standard**

A temporary restraining order is meant to be used only in extraordinary circumstances. To establish entitlement to a TRO, the requesting party must show (1) that she is likely to succeed on the merits, (2) that she is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in her favor, and (4) that an injunction is in the public interest. Winter v. Natural Res. Defense Counsel, 555 U.S. 7, 20 (2008). A TRO may be warranted where a party (1) shows a combination of probable success on the merits and the possibility of irreparable harm, or (2) raises serious questions and the balance of hardships tips in favor of a TRO. See Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th Cir. 1987). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." Id. Under both formulations, however, the party must demonstrate a "fair chance of success on

///
///
///
///

5

the merits" and a "significant threat of irreparable injury."[4] Id.

## III. Discussion

Plaintiffs have provided extensive evidentiary support for their Application in the form of declarations, e-mails, photographs, and screen shots spanning approximately one thousand pages. Plaintiffs' legal theories, however, are developed less thoroughly. Much of Plaintiffs' memorandum in support of their Application focuses on unfair competition under the Lanham Act. Plaintiffs' Complaint, however, lumps together Lanham Act claims for trademark infringement, trade dress infringement, false designation of origin, and trademark dilution into one single cause of action. Plaintiff's Application for a TRO appears to focus on the trademark claim. (App. at 16 ("Plaintiffs are entitled to protection of its unregistered trademark names . . . .").)

The analysis for an unregistered trademark is similar to that for trade dress. Int'l Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 824 (9th Cir. 1993). Plaintiffs must show that an unregistered trademark or trade dress is nonfunctional, is distinctive or has acquired secondary meaning, and that a defendant's use of a similar mark or trade dress is likely to confuse consumers. Id. at 824-25.

Plaintiffs' Application and Complaint, however, do not clearly identify the particular mark or trade dress that forms the

---

[4] Even under the "serious interests" sliding scale test, a plaintiff must satisfy the four Winter factors and demonstrate "that there is a likelihood of irreparable injury and that the injunction is in the public interest." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).

6

basis of Plaintiffs' unfair competition claim. Plaintiffs' Application, for example, refers to unregistered marks "Ballin Paris," "Homies," "Fèline," "Caninè," and "Bucci," but also the "cut, color, style, fabric, stitching, label sizes, text, logo placement, font, and packaging" of Brian's products. (App. at 14, 16.) The complaint refers in one place to "the name 'Ballin' and 'Ballin Paris'" (Compl. ¶ 102,), but immediately thereafter refers to wrongful appropriation of "fabrics, stitching, and label location" (Compl. ¶ 103), and yet elsewhere defines the "BRIAN LICHTENBERG Trademark" as comprised of "fashion apparel, merchandise and accessories." (Compl. ¶ 22.) Without a better sense of which marks or trade dress Plaintiffs seek to protect, it is impossible for this court to analyze functionality, distinctiveness, or likelihood of confusion, and thus to determine the likelihood that Plaintiffs will succeed on the merits of any of their infringement claims.[5]

Plaintiffs also seek a TRO on the basis of their Lanham Act false advertising claim, California Uniform Trade Secrets Act claim, and intentional interference with contract and prospective economic relations claims. Beyond generally and conclusorily contesting authorship of the Ballin Design, Defendants' opposition does not address these claims. While Plaintiffs themselves devote far less attention to these claims than the infringement claims, the record presented could support a finding of likely success on

---

[5] Plaintiffs cannot possibly hope, for example, to succeed on a claim that they have a claim to a trademark in "fashion apparel, merchandise and accessories." Some combination of the various elements identified above, however, might conceivably warrant trademark or trade dress protection.

7

the merits. There is ample evidence that Chris appropriated Brian's promotional photos and made statements claiming or suggesting that the apparel depicted therein was his, not Brian's. See Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997) (listing elements of Lanham Act false advertising claim). It also appears beyond dispute that Chris contacted Brian's customers, encouraged them to stop doing business with Brian, and claimed Brian is a thief. See Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1153 (2003) (listing elements of intentional interference with prospective economic advantage claim); Quelimane Co. v. Stewart Title Guaranty Co., 19 Cal. 4th 26, 55 (1998) (listing elements of interference with contract claim).

Nevertheless, the court does not address Plaintiffs' likelihood of success in further depth because Plaintiffs have failed to adequately show irreparable harm. In analyzing irreparable harm, courts should take into account whether a movant "proceeded as quickly as it could have" in seeking a TRO. Apple, Inc. v. Samsung Electronics Co., Ltd., 678 F.3d 1314, 1325 (Fed. Cir. 2012) (analyzing a preliminary injunction). At the TRO stage, courts consider whether the movant would have been able to file a noticed preliminary injunction motion had it acted diligently. See, e.g., Occupy Sacramento v. City of Sacramento, 2:11-CV-02873-MCE, 2011 WL 5374748, at *4 (E.D. Cal. Nov.4, 2011) (denying application for TRO for twenty-five day delay); Mammoth Specialty Lodging, LLC v. We-Ka-Jassa Inv. Fund, LLC, CIVS10-0864 LKK/JFM, 2010 WL 1539811, at *2 (E.D. Cal. Apr. 16, 2010); Rosal

v. First Fed. Bank of California, No. C 09-1276 PJH, 2009 WL 837570, at *2 (N.D. Cal. Mar. 26, 2009).

Here, the vast majority of Chris' alleged misappropriation of photographs and wrongful contact with Brian's distributors and customers appears to have taken place in between February and April 2013, approximately six to eight months ago. The most recent such instance appears to have occurred on May 18, 2013, over five months ago. (Declaration of Reda Bouaissa ¶ 66.)[6] While Plaintiffs attribute the roughly thirty-day delay between the filing of their complaint and the instant Application to the necessity of preparing voluminous documentary support, Plaintiffs make no attempt to explain why they did not seek preliminary relief here until six to eight months after the alleged wrongful acts occurred.[7] Plaintiffs do not contend, nor has the court found any evidence, that Chris' alleged wrongful acts persisted beyond May 2013 or are continuing. Accordingly, the court cannot conclude that Plaintiffs will suffer irreparable harm in the absence of a TRO.

///
///

---

[6] The court notes that Plaintiffs' citations to the record in support of their showing of irreparable harm are extremely unfocused. Plaintiffs cite, for example, over a dozen exhibits and approximately one hundred paragraphs of witness declarations for the proposition that Chris' actions are currently doing injury to Brian's reputation. Several of Plaintiffs' citations, however, are completely unrelated to that claim. (See, e.g., B. Lichtenberg Decl. ¶ 72 ("On or about January 25, 2013, I learned that Chris was still sick from the day before and was 'bed ridden' and feeling horrible.")

[7] The state court denied Plaintiffs preliminary injunctive relief on April 19, 2013. (Defendantants' Request for Judicial Notice, Ex. J.)

**IV. Conclusion**

For the reasons stated above, Plaintiffs' Application for a Temporary Restraining Order is DENIED, without prejudice.

IT IS SO ORDERED.

Dated: October 25, 2013

DEAN D. PREGERSON
United States District Judge

10