1

2

3                                                                    O

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11   BRIAN LICHTENBERG,LLC, a      )   Case No. CV 13-06837 DDP (PJWx)
     California limited liability  )
12   company; BRIAN LICHTENBERG,   )
     an individual,                )
13                                 )
                    Plaintiffs,    )
14                                 )   **ORDER GRANTING PLAINTIFFS' MOTION**
          v.                       )   **FOR PRELIMINARY INJUNCTION IN**
15                                 )   **PART AND DENYING IN PART**
     ALEX & CHLOE, INC., a         )
16   California corporation;       )
     CHRISTOPHER WALTER            )
17   LICHTENBERG, an individual;   )
     MARKED SHOWROOM, LLC, a       )   [Dkt. No. 73]
18   Californai limited liability  )
     company; JACQUELINE YI, an    )
19   individual; TU TRAN, an       )
     individual KYLE MOCKETT, an   )
20   individual; KAYTEE ENRIGHT,   )
     an individual,                )
21                                 )
                    Defendants.    )
22   _____)

23

24        Presently before the court is Plaintiffs' Motion for

25   Preliminary Injunction.  Having considered the parties' submissions

26   and heard oral argument, the court grants the motion in part,

27   denies the motion in part, and adopts the following order.

28   ///

# I.   Background

## A.   Factual Background

As described more extensively in this court's prior orders, Plaintiff Brian Lichtenberg ("Brian") designs clothing and accessories and distributes his products through Brian Lichtenberg, LLC.[1]  (Second Amended Complaint ("SAC") ¶¶ 16-17.)  Brian's designs include a series of parodies of designer brands, such as "Homiès" as a play on "Hermès" and "Bucci," a parody of "Gucci." (SAC ¶ 18.)  Brian's spoof or parody logos mimic the style, font, and other elements of the luxury brand designs.  (Id.)  Brian sells shirts, sweatshirts, pants, beanies, and hats bearing the various spoof designs.  (SAC ¶¶ 16-18.)  Brian alleges that his designs are very successful, and are frequently worn by celebrities and featured in the media.  (SAC ¶¶ 19-22.)

Brian's younger brother, Defendant Christopher Walter Lichtenberg ("Chris"), is the sole shareholder or principal of Defendant Alex and Chloe, Inc. ("A&C").  (SAC ¶¶ 3-4.)

The SAC alleges that in January 2012, Brian developed one particular parody design, "Ballin," as a play on the luxury brand "Balmain."  (SAC ¶ 43.)  By November 2012, Chris was working as a "part-time contractor" for Brian.  (SAC ¶ 46.)  Chris' duties included graphic design and promotional work related to Brian's "Ballin with My Homies" project.  (Id.)  In connection with those

---

[1] Plaintiff Brian Lichtenberg and Defendant Christopher Lichtenberg are brothers.  For clarity's sake, this Order refers to these parties by their first names.  Hereinafter, this Order frequently refers to Plaintiffs Brian Lichtenberg and Brian Lichtenberg, LLC, collectively, as "Brian."

duties, Chris allegedly had access to confidential lists of Brian's customers and industry contacts. (SAC ¶ 47.)

The SAC alleges that Chris copied and claimed ownership of the "Ballin" design, contacted Brian's manufacturer and requested that products identical to Brian's be made under the A&C label, and used Brian's confidential customer lists to sell the A&C version of the "Ballin" items. (SAC ¶¶ 51-56.) Chris listed his products for sale on the A&C website in late January or early February 2013, before Brian's "Ballin" products came to market. (Id.)

Chris repeatedly claimed to own the "Ballin" design via the internet and social media. (SAC ¶¶ 66-68.) Chris also contacted several of Brian's buyers, stated that Brian's "Ballin" products were counterfeits, and asked that retailers stop selling Brian's "Ballin" products. (SAC ¶¶ 58-60; 63-65.) Chris then made further public statements claiming that Brian had stolen not only the "Ballin" design, but other parody designs as well. (SAC ¶¶ 67-68.) At Chris's request, social media sites removed images of Brian's "Ballin" apparel posted to Brian's pages. (SAC ¶ 73.)

Chris and A&C then expanded their offerings to include other products similar to Brian's, featuring other parody designs beyond "Ballin." (SAC ¶ 86.) Chris also appropriated photographs of celebrities wearing Brian's products, then claimed on the A&C website and elsewhere that those celebrities endorsed A&C. (SAC ¶¶ 80-82, 84-85.)

B.   Procedural History

Plaintiffs filed an initial complaint in this court on

September 17, 2013.  Plaintiffs filed an ex parte application for a temporary restraining order on October 17, 2013.  After full briefing, this court denied Plaintiffs' application on October 25, based largely on Plaintiffs' failure to show any continuing wrongful acts or threat of irreparable harm.  (Order Denying Plaintiffs' Ex Parte Application for a TRO, Dkt. 44 at 8-9.)

After subsequent motion practice, Plaintiffs filed the Second Amended Complaint on February 28, 2014.  Plaintiffs' SAC alleges nine causes of action against Defendants, including trade dress infringement, unfair competition and false designation of origin, and trademark dilution under Section 43 of the Lanham Act, 15 U.S.C. § 1125, as well as state law causes of action, including unfair business practices in violation of California Business & Professions Code Section 17200.  This court denied Defendants' Motion to Dismiss the SAC on April 15, 2014.  (Dkt. 72.) Plaintiffs now seek a preliminary injunction enjoining Defendants from utilizing Plaintiffs' alleged trade dress and customer and manufacturer information, suggesting that pictures of Plaintiffs' products are in fact Defendants' products, interfering with Plaintiffs' business relationships, and publishing statements challenging Plaintiffs' creation and ownership of the allegedly protected trade dress.

**II.  Legal Standard**

A private party seeking a preliminary injunction must show that: (i) it is likely to succeed on the merits; (ii) it will suffer irreparable harm in the absence of preliminary relief; (iii)

1 the balancing of the hardships and equities between the parties
2 that would result from the issuance or denial of the injunction
3 tips in its favor; and (iv) an injunction will be in the public
4 interest.  <u>Winter v. Natural Res. Defense Counsel</u>, 555 U.S. 7, 20
5 (2008).  Preliminary relief may be warranted where a party: (i)
6 shows a combination of probable success on the merits and the
7 possibility of irreparable harm; or (ii) raises serious questions
8 on such matters and shows that the balance of hardships tips in
9 favor of an injunction.  <u>See</u> <u>Arcamuzi v. Continental Air Lines,</u>
10 <u>Inc.</u>, 819 F.2d 935, 937 (9th Cir. 1987). "These two formulations
11 represent two points on a sliding scale in which the required
12 degree of irreparable harm increases as the probability of success
13 decreases."  <u>Id.</u>  Under both formulations, the party must
14 demonstrate a "fair chance of success on the merits" and a
15 "significant threat of irreparable injury" absent the issuance of
16 the requested injunctive relief.[2]  <u>Id.</u>

17 **III. Discussion**

18     A.   Likelihood of Success on the Merits

19         1.   Trade Dress Infringement

20     Trade dress, or the "total image of a product," is protectable
21 under Section 43(a) of the Lanham Act.  <u>Int'l Jensen, Inc. v.</u>
22 <u>Metrosound U.S.A., Inc.</u>, 4 F.3d 819, 822 (9th Cir. 1993).  To
23 succeed on a trade dress infringement claim, which is analytically
24 similar to an unregistered trademark claim, plaintiffs must show
25 that a trade dress is nonfunctional, is distinctive or has acquired

---

26     [2] Even under the "serious interests" sliding scale test, a
27 plaintiff must satisfy the four <u>Winter</u> factors and demonstrate
"that there is a likelihood of irreparable injury and that the
28 injunction is in the public interest."  <u>Alliance for the Wild</u>
<u>Rockies v. Cottrell</u>, 632 F.3d 1127, 1135 (9th Cir. 2011).

secondary meaning, and that a defendant's use of a similar mark or trade dress is likely to confuse consumers.  <u>Id.</u> at 823.

The SAC lays claim to trade dress comprised of (1) humorous logos parodying famous designer names; (2) large block lettering mimicking the font used by the designer; (3) gold, gold foil, pink, pink foil, white, and black lettering on a red, hot pink, orange, black, bright blue, neon yellow, or lavender fabric; (4) 40-weight cotton "with a certain . . . cut, and dying and (enzyme) washing process;" (5) screen printing (with respect to shirts); (6) a "bulky and shapeless look;" (7) labels of a certain material, construction, and size; (8) woven stitching; (9)hangtags with a Century Gothic font; and (10) embroidery (with respect to hats). (SAC ¶ 18.)

a.   Secondary Meaning

Plaintiffs contend that their trade dress has acquired secondary meaning.  (Motion at 11.)  "To show secondary meaning, a plaintiff must demonstrate a mental recognition in buyers' and potential buyers' minds that products connected with the [trade dress] are associated with the same source."  <u>Art Attacks Ink, LLC v. MGA Entm't Inc.</u>, 581 F.3d 1138, 1145 (9th Cir. 2009) (quoting <u>Japan Telecom v. Japaen Telecom Am.</u>, 287 F.3d 866, 866-67 (9th Cir. 2002) (internal quotation omitted); <u>see also Clicks Billiards, Inc. v. Sixshooters, Inc.</u>, 251 F.3d 1252, 1260 (9th Cir. 2001).

Here, Plaintiffs confine their argument with respect to secondary meaning to a single sentence.  Plaintiffs assert that "as a result of large amounts of resources expended by Plaintiffs on publicity and [] marketing . . ., consumers identify the trade

dress of Platintiffs' BLTEE Products as being directly associated with Plaintiffs." (Mot. at 11:10-13.) Plaintiffs support their position with citations to declarations provided by Brian and his Head of Sales, Reda Bouissa. Both Declarants state that Brian has spent millions of dollars in marketing through various channels. (Declaration of Reda Bouissa ¶ 11; Declaration of Brian Lichtenberg ¶ 15.)

Advertising expenditures alone, however, cannot establish secondary meaning. Rather, "the true test of secondary meaning is the effectiveness of the advertising effort." Art Attacks, 581 F.3d at 1146 (citing Int'l Jensen, 4 F.3d at 824) (internal quotation omitted). Though both Brian and Bouaissa state that advertising has led consumers and celebrities to "instantly recognize the BLTEE Line" by "feel and appearance," neither declarant provides any support for such claims. (Bouiassa Decl. ¶ 13; B. Lichtenberg Decl. ¶ 16.) Similarly, declarant Jennifer Green, a fashion producer who knows Brian personally and counts him among her clients, states that (1) Brian's advertising has made him well known to consumers and (2) Brian's products, particularly "Ballin Paris" products, are identifiable as Brian's. (Declaration of Jennifer Green ¶¶ 14-15.)

Even putting aside the apparent lack of foundation for these statements, declarations from Plaintiff and his personal associates are of little probative value. Self-Realization Fellowship Church v. Ananda Church of Self-Realization, 59 F.3d 902, 910 (9th Cir. 1995). "Attestations from person[s] in close association and intimate contact with [a plaintiff's] business do not reflect the

1    views of the purchasing public." <u>Id.</u> (internal quotations and

2    citations omitted).

3

4        In their Reply, Plaintiffs cite, for the first time, to five

5    additional declarations.  Claude Benoualid, an investor who has

6    considered investing in Brian's company and has been tracking

7    Brian's increase in popularity "for years," states that he finds

8    Brian's products to be unique. (Declaration of Claude Benoualid ¶¶

9    3, 5-7.)  Two boutique owners, who have had ongoing business

10   relationships with Brian for years, state that Brian's products are

11   popular. (Declaration of Fraser Ross ¶¶ 3, 6; Declaration of

12   Gabriele Bohlen ¶¶ 2-3.)  A fashion stylist who has been a

13   professional client of Brian's "for many years," and was

14   "immediately impressed with his talents," states that celebrities

15   often request Brian's products. (Declaration of Brittany Bardo ¶¶

16   2-3, 7.)  Lastly, a fashion model who has personally known Brian

17   for years and is a "fan" of his products states that Brian is well

18   known for his spoof clothing line. (Declaration of Jasmine Tookes

19   ¶¶ 4, 7.)

20       As with the declarations cited initially, these statements

21   shed little light on the perceptions of the consuming public.  Even

22   if these statements were sufficient to demonstrate that consumers

23   generally like Brian's products, that preference does not

24   necessarily establish that the public associates the trade dress at

25   issue here with Brian.  Furthermore, as explained above and by the

26   Ninth Circuit, "[t]rademark law is skeptical of the ability of an

27   associate of a trademark holder to transcend personal biases to

28

give an impartial account of the value of the holder's mark."[3]
Self-Realization Fellowship, 59 F.3d at 910.

Plaintiffs have not adequately shown, at this stage, that the
alleged trade dress has acquired secondary meaning.  Plaintiffs
have not, therefore, shown a likelihood of success on their trade
dress infringement claim.[4]

    2.   Trade Dress Dilution

    As provided in 15 U.S.C. § 25(c):

        Subject to the principles of equity, the owner of a famous
        mark that is distinctive, inherently or through acquired
        distinctiveness, shall be entitled to an injunction against
        another person who, at any time after the owner's mark has
        become famous, commences use of a mark or trade name in
        commerce that is likely to cause dilution by blurring or
        dilution by tarnishment of the famous mark, regardless of
        the presence or absence of actual or likely confusion, of
        competition, or of actual economic injury.[5]

15 U.S.C. § 25(c)(1).  To prevail, Plaintiffs must show that
(1)they own a famous, distinctive mark or dress; (2) Defendants
have used a nearly identical mark in commerce after Plaintiffs'
mark became famous, and (3) Defendants' use is likely to dilute or
blur Plaintiffs' mark.  Levi Strauss & Co. v. Abercrombie & Fitch
Trading Co., 633 F.3d 1158, 1161 (9th Cir. 2011).  "[A] trade dress
cannot be diluted unless it is famous such that is truly prominent
and renowned among the general public."  Apple, Inc. v. Samsung
Elec. Co., Ltd., 920 F.Supp.2d 1079, 1097 (N.D. Cal. 2013)
(citation and quotation omitted).  For the reasons discussed above,

_____

[3] "[T]he analysis for trade dress and an unregistered
trademark under section 43(a) of the Lanham Act is very similar."
Int'l Jensen, 4 F.3d at 822.
[4]    In light of Plaintiffs' failure to demonstrate secondary
meaning, the court need not address functionality or likelihood of
confusion.
[5] Other remedies beyond injunctive relief may also be
available.  15 U.S.C. § 1125(c)(5).

Plaintiffs have not demonstrated that their trade dress is sufficiently known to the general public.  Plaintiffs therefore have not shown a likelihood of success on the merits of their trade dress dilution claim.

> 3.   Unfair Competition and False Designation of Origin

The Lanham Acts prohibits uses in commerce of:

> any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities[.]

15 U.S.C. § 1125(a)(1).  In other words, "the Lanham Act . . . prohibits the use of false designations of origin, false descriptions, and false representations in the advertizing [sic] and sale of goods and services." Jack Russell Terrier Network v. Am. Kennel Club, Inc., 407 F.3d 1027, 1036 (9th Cir. 2005).  These prohibitions include false endorsements. See Cairns v. Franling Mint Co., 292 F.3d 1139, 1149 (9th Cir. 2002); see also Brown v. Elec. Arts, Inc., 724 F.3d 1235, 1239 n.1 (9th Cir. 2013).

Plaintiffs' SAC alleges that "Defendants . . . stole press and publicity photos from [Brian] regarding [celebrities] Nina Garcia and Justin Bieber, who were wearing [Brian's] products.  Defendants . . . copied and pasted the photos to the A&C website, making it appear such celebrities were wearing the [Defendants'] imitation

products." (SAC ¶ 80.)  The SAC includes other, similar

allegations that Defendants misappropriated photographs of

celebrities wearing Brian's products, and specifically names over a

dozen celebrities. (SAC ¶¶ 81-82, 84-85.)  Defendants have

submitted numerous examples of such uses. (e.g. Green Decl. ¶ 24,

Ex. C; Tookes Decl. ¶ 14.)

     False advertising claims under the Lanham Act require five

elements:

     (1) a false statement of fact by the defendant in a
     commercial advertisement about its own or another's
     product;

     (2) the statement actually deceived or has the tendency to
     deceive a substantial segment of its audience;

     (3) the deception is material, in that it is likely to
     influence the purchasing decision;

     (4) the defendant caused its false statement to enter
     interstate commerce; and

     (5) the plaintiff has been or is likely to be injured as a
     result of the false statement, either by direct diversion
     of sales from itself to defendant or by a lessening of the
     goodwill associated with its products

Skydive Arizona, Inc. v. Quattrochi, 673 F.3d 1105, 1110 (9th Cir.

2012).  Defendants appear to argue that Plaintiffs cannot succeed

because Defendants have only referred to the "Ballin Paris" design,

as opposed to "Ballin Paris" products. (Opposition at 17.)  Thus,

Defendants appear to assert, Plaintiffs cannot show that Defendants

made any false statements of fact.

     Defendants are mistaken.  First, Plaintiffs need not show that

a particular statement was literally false. "To demonstrate

falsity within the meaning of the Lanham Act, a plaintiff may show

that the statement was literally false, either on its face or by

1  implication, or that the statement was literally true but likely to

2  mislead or confuse consumers."  <u>Southland Sod Farms v. Sover Seed</u>

3  <u>Co.</u>, 108 F.3d 1134, 1139 (9th Cir. 1997).

4

5      Plaintiffs provide several examples of Defendants' false

   statements.  One image from an A&C website, for example, depicts a

6  celebrity wearing one of Brian's t-shirts in a music video.  (Green

7  Decl., Ex. C.)  The accompanying text, however, identifies the

8  celebrity as "wearing an ALEX & CHLOE original Ballin Paris

9  design."  (<u>Id.</u>)  Such a statement is false by implication or, at

10 best, likely to mislead consumers.  Furthermore, Defendants'

11 contention that all of their communications refer to the "Ballin

12 Paris" design is not borne out by the record.  In one instance, for

13 example, a fashion model posed for photos in one of Brian's

14 sweatshirts outside Brian's press showroom.  (Tookes Decl. ¶ 11.)

15 The model granted Brian permission to use the photos and posted

16 them to her own social media site as well.  (<u>Id.</u> ¶¶ 12-13.)  Later,

17 the image appeared on A&C's product sales page, with no limiting

18 reference to a "design," but rather to a "'Ballin Paris' Printed

19 Fleece Sweatshirt by Alex & Chloe."  (<u>Id.</u> ¶¶ 14.)

20

21     Consumers' confusion and displeasure, and harm to Plaintiffs,

22 is evident from numerous internet posts, as well as from

23 declarations from retailers whose customers demanded refunds.

24 (e.g. Bohlen Decl. ¶¶ 16-17.)  Plaintiffs have demonstrated a high

25 likelihood of success on the merits of their unfair competition

26 claim.

27     4.   Interference with Economic Relations

28

12

1    The SAC alleges claims for intentional interference with
2  existing contracts and prospective economic relations.  An
3  intentional interference with prospective economic relations claim
4  requires (1) an economic relationship between plaintiff and a third
5  party with the probability of future economic benefit to the
6  plaintiff, (2) defendant's knowledge of that relationship, (3)
7  defendant's intentional, independently wrongful act to disrupt the
8  relationship, (4) actual disruption, and (5) economic harm to the
9  plaintiff.  Marsh v. Anesthesia Serv. Med. Group. Inc., 200
10 Cal.App.4th 480, 504 (2011) (citing Korea Supply v. Lockheed Martin
11 Corp., 29 Cal.4th 1134, 1153 (2003)).  The elements of an
12 intentional interference with contract claim are similar.  See
13 Quelimane Co. v. Stewart Title Guar. Co., 19 Cal.4th 26, 55 (1998).

14    Plaintiffs have offered extensive evidence that Chris
15 contacted Brian's customers and urged them to buy A&C products
16 instead of Brian's products.  (Bouaissa Decl. ¶ 23.)  Chris also
17 sent cease and desist letters to sellers of Brian's products,
18 stating that Chris, and not Brian, created the "Ballin Paris" line
19 of products.  (Ross Decl. ¶ 7.)

20
21    Defendants' position regarding the intentional interference
   claims is difficult to discern.  Defendants argue that these claims
22 cannot succeed because Plaintiffs do not have protectable trade
23 dress and because A&C released its allegedly infringing products
24 first.  (Opp. at 20).  The relevance of these arguments, which are
25 not supported by any authority or evidence, beyond Chris'
26 declaration that he released his products first, is unclear.
27 Plaintiffs' intentional interference claims appear likely to
28

13

succeed.

　　　　5.　　California Uniform Trade Secrets Act

　　　To prevail on a claim under California's Uniform Trade Secrets Act ("CUTSA"), California Civil Code § 3426, a plaintiff must show that (1) he owned a trade secret, (2) the defendant acquired, used, or disclosed that secret through improper means, and (3) the plaintiff was damaged. Cytodyn, Inc. V. Amerimmune Pharms., Inc., 160 Cal. App. 4th 288, 297 (2008). The California Civil Code defines "trade secret" as information that "(1) [d]erives independent economic value . . . from not being generally known to the public . . .; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). Plaintiffs assert that their customer and manufacturer lists, and the parody names "Ballin" and "Ballin Paris," were trade secrets. (SAC ¶¶ 104-106.)

　　　"It is well-established that a customer list may constitute a protectable trade secret." Gable Leigh, Inc. v. North Am. Miss; No. CV 01-01019 MMM(SHX); 2001 WL 521695 at *15 (C.D. Cal. Apr. 13, 2001). "[W]here the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market." Mor-Life, Inc. v. Perry, 56 Cal. App. 4th 1514, 1521 (1997).

　　　The evidence regarding Plaintiffs' CUTSA claim is less extensive than that regarding other claims. Brian states that the customer lists are a compilation of company names, contact people,

14

notes, and contact information, some of which is non-public.  (B. Lichtenberg Decl. ¶ 26.)  Brian further states that the lists took years to compile.  (Id.)  Both Brian and his Head of Sales told Chris that the contact lists were confidential.  (Id. ¶ 28; Bouiassa Decl. ¶ 19.)

Defendants' contention that "Defendants contacted vendors already carrying the parody line" appears to suggest that Chris could not have appropriated trade secrets because he only contacted stores that were already and publicly carrying Brian's products. (Opp. at 21.)  That fact, however, has no bearing on whether Chris improperly used confidential information, such as private e-mail addresses and phone numbers, or Brian's customer notes, in reaching out to those stores.  Plaintiffs have shown some evidence that the lists were the product of Brian's time and effort, and that Brian and his staff took steps to preserve the secrecy of the lists. Plaintiffs have shown a likelihood of success on the CUTSA claim.

    6.   Defamation

    Plaintiffs have submitted evidence that Brian developed the "Ballin" design in January 2012.  (B. Lichtenberg Decl. ¶ 30, Ex. 2.)  Chris left Brian's employ and began selling his own "Ballin" products in January 2013.  Plaintiffs provide numerous examples of Defendants' statements that Brian did not develop the "Ballin" design.  (B. Lichtenberg Decl., Ex. 7.)  Defendants also disseminated claims that Brian stole the "Ballin" design and was selling counterfeit merchandise.  (Bohlen Decl. ¶ 13.)

///

1    Defendants conclusorily argue that Plaintiffs' Defamation
2  claim must fail because Defendants' statements "are in fact true."
3  (Opp. at 22.)   Defendants cite to no evidence to support this
4  assertion.   Plaintiffs are likely to succeed on their defamation
5  claim.

6  B.   Remaining Factors
7
8    Defendants' opposition briefly contends that Plaintiffs have
9  failed to demonstrate a likelihood of irreparable harm or that the
10  balance of equities tips in Plaintiffs' favor.   Those arguments,
11  however, focus on Plaintiffs' trade dress claims.   As discussed
12  above, Plaintiffs have not adequately demonstrated a likelihood of
13  success on the merits with respect to the trade dress claims.

14    With respect to those claims on which Plaintiffs have shown a
15  likelihood of success, the court is satisfied that the remaining
16  factors have been met.   "Evidence of loss of control over business
17  reputation and damage to goodwill" is sufficient to establish
18  irreparable harm.   Herb Reed Enters., LLC. v. Florida Entm't Mgmt.,
19  Inc., 736 F.3d 1239, 1250 (9th Cir. 2013).   Defendants' misleading
20  posts about the origins of certain products and suggestions that
21  Brian is a thief, discussed above, certainly have a negative impact
22  on Brian's reputation and goodwill, and are continuing.   Enjoining
23  such acts would serve the public interest, and would not impose any
24  undue hardship upon Defendants.[6]
25

26    _____
27    [6] Defendants' opposition does not explicitly identify any
   particular hardship, but appears to refer to hardships Defendant
   might suffer if their sales of Ballin' merchandise were to be
28  enjoined, presumably on the basis of Plaintiffs' trade dress
   claims.

16

## IV.   Conclusion

For the reasons stated above, Plaintiffs' Motion for Preliminary Injunction is GRANTED in part and DENIED in part. Plaintiffs have not demonstrated a likelihood of success on the merits of their trade dress infringement and dilution claims. Plaintiffs have satisfied their burden with respect to their unfair competition, intentional interference, trade secrets, and defamation claims.

Accordingly, Defendants, and all persons acting in concert with them, are restrained from:

1) the use of pictures of celebrities or others wearing Plaintiffs' products in any manner that would lead others to believe that such persons are wearing Defendants' products;

2) using in any way Plaintiffs' customer, distributor, or manufacturer lists;

3) contacting persons or entities with contracts for the purchase or sale of Plaintiffs's products, or who are in the business of purchasing or selling products similar to Plaintiffs' products for the purpose of encouraging such persons or entities not to do business with Plaintiffs and/or not to purchase or sell Plaintiffs' products; and

(4)  assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in the above paragraphs (1) through (3), or effecting any assignments or transfers, forming new entities or associations, or

17

utilizing any other device for the purpose of circumventing or
otherwise avoiding the prohibitions set forth in paragraphs (1)
through (3).

IT IS SO ORDERED.

Dated: July 25, 2014
                                    _____
                                    DEAN D. PREGERSON
                                    United States District Judge